**AMERICAN CYANAMID CO., Plaintiff,**

v.

**ETHICON, INC. and Johnson & Johnson, Inc., Defendants.**

**No. 76 Civ. 2301 (HFW).**

United States District Court, S. D. New York.

May 26, 1977.

---

**3.** *See* note 1 *supra.*

**47**

tion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for want of a justiciable controversy. In the alternative, they ask that the court decline to exercise jurisdiction as a matter of judicial discretion.

The complaint alleges that the Davis & Geck Department ("Davis & Geck") of the Lederle Laboratories at American Cyanamid Company ("Cyanamid") has developed a releasable surgical needle-suture combination ("releasable suture")[1] which it has distributed and marketed to hospitals and other clients in the City of New York and which it intends to market elsewhere; that the defendant Ethicon, Inc. ("Ethicon"), a wholly-owned subsidiary of co-defendant Johnson & Johnson, Inc. ("J & J"), is the assignee of United States Patent No. 3,890,-975 ("the 975 patent"), issued to Walter McGregor on June 24, 1975 (and entitled "Controlled Release Suture"); and that "it has become apparent to [Cyanamid] from prior actions of defendant, [sic] the largest manufacturer of surgical sutures in the United States, that defendant [sic] intends to protect and maintain its position in the suture market" through the use of its patents.[2] It is further alleged that responsible employees of defendant, having either actual or implied authority to speak for J & J, informed Davis & Geck that they knew of Cyanamid's efforts to develop a releasable suture and that "litigation would follow" any attempt by Cyanamid to introduce such a product into the market. The complaint also alleges that the 975 patent was prosecuted in the United States Patent Office by J & J and employees and agents of J & J, and that J & J improperly obtained the 975 patent through misrepresentations and omissions made during the course of prosecuting its application to the Patent Office. Cyanamid seeks, among other things, a dec-

Pennie & Edmonds, New York City, for plaintiff, by Jonathan A. Marshall, Thomas F. Reddy, Jr., Brian D. Coggio, New York City, of counsel.

Rogers & Wells, New York City, for defendants, by David F. Dobbins, Stephen Froling, New York City, of counsel.

## MEMORANDUM DECISION

WERKER, District Judge.

Defendants have moved to dismiss the complaint in this declaratory judgment ac-

1. A releasable suture allows the surgeon to separate the suture from the needle merely by pulling. (Plaintiff's Brief at 1.)

2. The complaint frequently refers to "defendant" without disclosing which of the defendants is meant. In each instance, however, it appears that references to one defendant apply specifically to Ethicon, which is, for example, the largest American manufacturer of surgical sutures.

laration of noninfringement and invalidity with respect to the 975 patent.

## I

■ Under the Declaratory Judgment Act,[3] "in a case of *actual controversy*" a district court may "declare the rights and other legal relations of any interested party." (Emphasis added.) To meet this statutory requirement of an actual controversy and therefore to be justiciable under Article III of the United States Constitution, the disagreement between the litigants must be one which is "definite and concrete," rather than one which presents only an abstract or hypothetical question for the court to determine. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 239–41, 81 L.Ed. 617 (1937). This necessarily presents a question of degree, *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), to be determined on a case-by-case basis. *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 504 (2d Cir. 1968).

■ In the area of patents, the courts have rejected rigid formulations of the test for an actual controversy, *e. g., Wallace & Tiernan, Inc. v. General Electric Co.*, 291 F.Supp. 217, 220 (S.D.N.Y.1968). Still, it is clear that "a justiciable controversy is present if defendant, the patentee, has charged plaintiff with infringement or has threatened plaintiff with an infringement suit, either directly or indirectly," *Muller v. Olin Mathieson Chemical Corp., supra*, 404 F.2d at 504; *accord, Dr. Beck and Co., G. M. B. H. v. General Electric Co.*, 317 F.2d 538, 539 (2d Cir. 1963) (*per curiam*), and the plaintiff has already begun to produce and sell the allegedly infringing device or has made substantial preparations to do so. *Wembley v. Superba Cravats*, 315 F.2d 87, 89–90 (2d Cir. 1963); *Dewey & Almy Chemical Co. v. American Anode, Inc.*, 137 F.2d 68, 70 (3d Cir.), *cert. denied*, 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943); *Volkswagen of America, Inc. v. Engelhard Minerals & Chemicals Corp.*, 401 F.Supp. 1210, 1213

(S.D.N.Y.1975). "The touchstone is a *reasonable* apprehension" on the part of the plaintiff that beginning or continuing the activity in question will subject him or his customers to either an action for infringement or the threat that such an action will be brought. *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F.Supp. 219, 237 (D.N.J. 1966) (emphasis in original); *accord, Sherwood Medical Industries, Inc. v. Deknatel, Inc.*, 512 F.2d 724, 727–28 (8th Cir. 1975); *Tubeco, Inc. v. Crippen Pipe Fabrication Corp.*, 402 F.Supp. 838, 844–45 (E.D.N.Y. 1975), *aff'd* 538 F.2d 314 (2d Cir. 1976). "There must be, in other words, some concrete indication that the defendant patentee claims the plaintiff's activity infringes his patent, and also that he will act affirmatively to enforce the protection which he claims." *Japan Gas Lighter Ass'n v. Ronson Corp., supra*, 257 F.Supp. at 237.

■ In making this determination, the court should view the requirement of a charge of infringement with considerable liberality, *Muller v. Olin Mathieson Chemical Corp., supra*, 404 F.2d at 504; *see* 6A Moore's Federal Practice ¶ 57.20 (2d ed. 1974), since the Declaratory Judgment Act itself is to be given a liberal construction, *e. g., Swift & Sons, Inc. v. Lemon*, 24 F.R.D. 43, 46 (S.D.N.Y.1959), to advance the salutary purposes underlying the remedy of declaratory relief, *see Printing Plate Supply v. Curtis Publishing Co.*, 278 F.Supp. 642, 645 (E.D.Pa.1968); *see generally* E. Borchard, Declaratory Judgments (2d ed. 1941). Thus, in determining whether a charge reasonably can be inferred, "the court must look at the *entire course* of action and *all* of the defendant's relevant conduct," *Sherwood Medical Industries v. Deknatel, Inc., supra*, 512 F.2d at 728 (emphasis in original), carefully weighing the business realities involved. *See Mine Safety Appliance Co. v. Energetics Science, Inc.*, 416 F.Supp. 530, 532 (S.D.N.Y.1976).

## II

Since the parties seem to agree that Cyanamid began to produce and market

---

**3.** 28 U.S.C. § 2201 *et seq.* (1970).

releasable sutures by at least May 26, 1976, the date on which the complaint herein was filed, defendants correctly observe that the sole issue before the court for present purposes becomes whether Cyanamid had a reasonable apprehension that defendants would sue or threaten suit for infringement of the 975 patent held by Ethicon as assignee.

Cyanamid's fear of suit apparently derives from two in-house memoranda, each of which was executed by a Cyanamid employee to summarize a conversation with a managerial employee of Ethicon. The first such memorandum, from W.R. Deakin of the Davis & Geck Marketing Department to a C.B. Walker, is dated February 9, 1976. It indicates that on January 28, 1976, Deakin attended the Annual Meeting of the Society of Thoracic Surgeons at the Washington, D.C. Hilton, where he had a brief conversation with John Balenko, Ethicon's product manager for cardiovascular sutures, and it goes on to state that, to the best of his recollection, "in substance":

> Mr. Balenko made the statement that he heard that we were working on a DAVIS & GECK equivalent to a control release needle, and he had heard that we were going to introduce them soon. I replied that yes, we had done some work on them but that there were a lot of problems involved. *He replied that he was not the least bit surprised since it had taken Ethicon 10 years to develop them but that whatever we did in this area we better look out.* This was the end of our discussion on the subject of control release needles.

(Plaintiff's Document A00038) (emphasis added). In the second memorandum, dated May 17, 1976, T.R. Lind of the Davis & Geck Marketing Department summarizes events which took place on May 12, 1976, after a meeting of the Sales Training Committee of the Health Industry Manufacturers Association held in Lincolnshire, Illinois. Lind's memorandum observes that:

> Following the meeting and a group dinner about six of the Committee members including Mr. O'Brien [Ethicon's Manager of Sales Administration] and myself, were seated at the bar for a nightcap. At one point in the evening I was seated next to Mr. O'Brien and in the course of conversation he revealed that he had been called upon to give a deposition in connection with a lawsuit between DAVIS & GECK and Ethicon. I stated that this presumably was a DEXON® polyglycolic acid suture/Vicryl lawsuit and he said, no, that it was some other lawsuit, observing that there was a lot of litigation between our two companies. *At this point I asked him if Ethicon would sue DAVIS & GECK for patent infringement when and if we introduced our version of the controlled release needle. He replied that they probably would.*

(Plaintiff's Document A00039) (emphasis added).

While recent decisions by this and other courts evidence progressively lower thresholds for patent suits to meet, it would still be unthinkable for the court to take jurisdiction of this action. Liberalized notions of justiciability are one thing; attempts to abandon the constitutional requirement of a case or controversy are quite another. To find a charge of infringement or threat of suit in Cyanamid's self-serving memoranda, the court would have to ignore both the circumstances surrounding the conversations reported and the logical meaning of the statements alleged to have been made. This, in good conscience, the court cannot do.

The participants in the conversations, after all, were not attorneys attempting to posture themselves or their clients for inevitable litigation, but rather marketing professionals exchanging notes. Moreover, their interchanges took place in an exhibit hall and a bar, locations not noted for serious discussions concerning actual controversies between corporate rivals. It is therefore apparent that Balenko was offering his counterpart no more than kindly advice, which might well have referred to the expense entailed in developing a successful releasable suture, not the possibility of a subsequent patent infringement suit.

O'Brien's statement followed a hypothetical question from a Davis & Geck employee and cannot be considered more than a conjectural response. Indeed, in view of the frequent legal squabbles between the parties, it demonstrates little more than an ability to foresee the likely repetition of past events.[4]

Cyanamid maintains that its apprehension was nevertheless reasonable given the parties' other activities. Thus, it notes Ethicon's allegedly predatory marketing tactics and willingness to bring patent matters before administrative and judicial bodies. Specifically, Cyanamid contends that Ethicon has "embarked upon a policy of acquiring *exclusive* rights to anything which might be useful as a suture material." However, the source relied upon for this contention, namely the deposition testimony of Dr. Walton van Winkle, a former Ethicon employee, merely suggests that—in the past—Ethicon has purchased technological innovations (such as a process for manufacturing absorbable surgical sutures) only when it has been promised exclusive rights to the advances acquired.[5] Ethicon's other purportedly hostile tactic consists, in essence, of competing with its competitors and not with itself. Surely, business practices as prudent as these cannot serve to elevate idle trade convention chatter into reasonably pointed commercial threats.

Nor can the pendency of other patent litigation between the parties make Cyanamid's alleged fears any more reasonable, for each and every proceeding cited relates to technologies concededly different from those in issue here and, with but one exception, involves only questions of foreign patent protection.[6] Even if these matters do reflect serious commercial disputes, as Cyanamid contends, the court concludes that concrete controversies involving foreign lands or alien technologies cannot place Cyanamid on *terra firma* here. See *Research Electronics Devices Co. v. Neptune Meter Co.*, 156 F.Supp. 484, 485–86 (S.D.N.Y.1957), aff'd on opinion below, 264 F.2d 246 (2d Cir. 1959).

Consequently, since Cyanamid has not cited any cases in which courts have exercised jurisdiction based upon conduct as innocuous as that relied upon here, it is apparent that this attempt to gain the procedural and psychological advantages of a declaratory judgment action must fail.[7] Defendants' motion is therefore granted and the complaint herein is dismissed.

SO ORDERED.

---

4. Cyanamid itself relies upon the pendency of a declaratory judgment action between the parties in New Jersey, *see* note 6 *infra*, and nine patent opposition proceedings in the United Kingdom, Canada, Australia, France and Germany.

5. *See* Deposition of Dr. Walton van Winkle, former Ethicon Vice President for Medical Affairs (Worldwide), dated March 17, 1976, at 182.

6. The exception, *Ethicon, Inc. v. American Cyanamid Co.*, No. 344–73 (D.N.J., *filed* March 12, 1974), is a declaratory judgment action seeking a declaration of noninfringement and invalidity with respect to Cyanamid's patent for synthetic absorbable sutures.

7. Under the Declaratory Judgment Act, a manufacturer can obtain a judicial declaration of his rights without waiting for a competing patentee to bring his infringement claims to court. But, as Justice Frankfurter once observed, the manufacturer *is* only to be given "an equal start to the courthouse not a headstart." *Kerotest Mfg. Co. v. C–O Two Fire Equipment Co.*, 342 U.S. 180, 185, 72 S.Ct. 219, 222, 96 L.Ed. 200 (1952).